**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

DAVID MONK,

            Plaintiff,

    v.

GOLDMAN SACHS & CO. LLC,
GOLDMAN SACHS GROUP, INC. and
"JANE/JOHN DOE," said individual being
unknown at this time,

            Defendants.

Civil Action No. 22-cv-6056 (JMF)

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS GOLDMAN SACHS & CO. LLC AND THE GOLDMAN SACHS
## GROUP, INC.'S MOTION TO COMPEL ARBITRATION AND DISMISS
## PROCEEDINGS PURSUANT TO THE FEDERAL ARBITRATION ACT, 9 U.S.C. § 4
## AND IN THE ALTERNATIVE, TO DISMISS PLAINTIFF DAVID MONK'S FIRST
## AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)

Jill L. Rosenberg
Mark R. Thompson
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Tel:  (212) 506-5000
Fax: (212) 506-5151
jrosenberg@orrick.com
mthompson@orrick.com

*Attorneys for Defendants Goldman Sachs & Co.*
*LLC and The Goldman Sachs Group, Inc.*

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.  FACTS ............................................................................................................... 3

    A.   NAMED PARTIES.......................................................................................... 3

        1.   GS GROUP.......................................................................................... 3

        2.   GS&CO.................................................................................................. 4

        3.   DAVID MONK ................................................................................. 4

    B.   MONK'S ARBITRATION AGREEMENTS....................................................... 4

        1.   THE U-4 AGREEMENT ................................................................. 5

        2.   THE CONFIDENTIALITY AGREEMENT ............................................. 5

        3.   THE SIGNATURE CARD AGREEMENTS ......................................... 5

        4.   THE SETTLEMENT AGREEMENT ................................................... 6

    C.   MONK'S ALLEGATIONS................................................................................ 7

    D.   MOORE'S DEPOSITION ................................................................................ 8

III. ARGUMENT................................................................................................... 10

    A.   THE COURT SHOULD GRANT THE GOLDMAN DEFENDANTS'
        MOTION TO COMPEL ARBITRATION........................................................... 10

    B.   THE FAA APPLIES TO THE ARBITRATION AGREEMENTS ..................... 10

    C.   MONK'S CLAIMS ARE SUBJECT TO ARBITRATION .............................. 11

        1.   MONK ENTERED INTO SEVERAL VALID AGREEMENTS
            TO ARBITRATE.............................................................................. 12

        2.   MONK'S CLAIMS FALL WITHIN THE SCOPE OF THE
            ARBITRATION AGREEMENTS..................................................... 13

            A.   MONK'S CLAIMS FALL WITHIN THE SCOPE OF THE
                U-4 AGREEMENT.................................................................. 13

            B.   MONK'S CLAIMS FALL WITHIN THE SCOPE OF THE
                CONFIDENTIALITY AGREEMENT, THE SIGNATURE
                CARD AGREEMENTS AND THE SETTLEMENT
                AGREEMENT. .......................................................................... 18

    D.   THE COURT SHOULD GRANT THE GOLDMAN DEFENDANTS'
        MOTION TO DISMISS ................................................................................... 21

        1.   APPLICABLE LEGAL STANDARD ..................................................... 21

# TABLE OF CONTENTS
(continued)

2.   THE COURT SHOULD DISMISS MONK'S CLAIM AGAINST THE GOLDMAN DEFENDANTS FOR RESPONDEAT SUPERIOR .......................................................................................... 21

　　A.   THE COURT SHOULD DISMISS MONK'S CLAIM FOR RESPONDEAT SUPERIOR BECAUSE IT IS NOT A SUBSTANTIVE CAUSE OF ACTION ..................................... 21

　　B.   THE COURT SHOULD DISMISS MONK'S CLAIM FOR RESPONDEAT SUPERIOR BECAUSE MONK'S ALLEGATIONS ARE INSUFFICIENT TO STATE A PLAUSIBLE CLAIM ................................................................. 22

3.   THE COURT SHOULD DISMISS MONK'S CLAIM AGAINST THE GOLDMAN DEFENDANTS FOR TORTIOUS INTERFERENCE ................................................................................. 24

4.   THE COURT SHOULD DISMISS MONK'S CLAIMS AGAINST DOE ........................................................................................... 25

IV.   CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Bruce Terminix Cos. v. Dobson*,
   513 U.S. 265 (1995)...................................................................................................10

*Arakawa v. Japan Network Grp.*,
   56 F. Supp. 2d 349 (S.D.N.Y. 1999)........................................................................19

*AREP Fifty-Seventh, LLC v. PMGP Assocs., L.P.*,
   981 N.Y.S.2d 406 (App. Div. 2014)..........................................................................24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...................................................................................................21

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011)...................................................................................................11

*Balan v. Tesla, Inc.*,
   840 F. App'x 303 (9th Cir. 2021) .............................................................................19

*Ben Hur Moving & Storage, Inc. v. Better Bus. Bureau of Metro. N. Y., Inc.*,
   No. 08-cv-6572, 2008 WL 4702458 (S.D.N.Y. Oct. 3, 2008)..................................22

*Berger v. Cantor Fitzgerald Sec.*,
   967 F. Supp. 91 (S.D.N.Y. 1997) .............................................................................13

*Biberaj v. Pritchard Indus., Inc.*,
   No. 08-cv-07993, 2009 WL 10738222 (S.D.N.Y. Sept. 28, 2009) .........................22

*Biswas v. City of New York*,
   973 F. Supp. 2d 504 (S.D.N.Y. 2013)......................................................................22

*Bucy v. Edward Jones & Co.*,
   445 P.3d 812 (Mont. 2019) .......................................................................................18

*Carvel Corp. v. Noonan*,
   818 N.E.2d 1100 (N.Y. 2004)...................................................................................24

*Chimart Assocs. v. Paul*,
   489 N.E.2d 231 (N.Y. 1986).....................................................................................12

*Christensen v. Nauman*,
   73 F. Supp. 3d 405 (S.D.N.Y. 2014).........................................................................15

iii

*Citizens Bank v. Alafabco, Inc.*,
    539 U.S. 52 (2003)................................................................................................10

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985)..............................................................................................12

*Dillon v. City of New York*,
    704 N.Y.S.2d 1 (App. Div. 1999).......................................................................17

*Doe v. Alsaud*,
    12 F. Supp. 3d 674 (S.D.N.Y. 2014)...................................................................23

*Ello v. Singh*,
    531 F. Supp. 2d 552 (S.D.N.Y. 2007).................................................................23

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018).........................................................................................11

*Feinberg v. Oppenheimer & Co.*,
    658 F. Supp. 892 (S.D.N.Y. 1987) ......................................................................19

*Friedman v. Coldwater Creek, Inc.*,
    321 F. App'x 58 (2d Cir. 2009) ...........................................................................24

*Genesco, Inc. v. T. Kakiuchi & Co.*,
    815 F.2d 840 (2d Cir. 1987).................................................................................15

*Gold v. Deutsche Aktiengesellschaft*,
    365 F.3d 144 (2d Cir. 2004).................................................................................12

*Greenberg v. Ameriprise Fin. Servs., Inc.*,
    No. 15-cv-3589, 2016 WL 3526025 (E.D.N.Y. Mar. 31, 2016)................................14, 18, 20

*Harris v. Mills*,
    572 F.3d 66 (2d Cir. 2009)...................................................................................21

*Jain v. City of New York*,
    No. 20-CV-5442, 2021 WL 6064204 (S.D.N.Y. Dec. 22, 2021) ..........................21

*Johnson v. Charles Schwab & Co.*,
    No. 09-CV-81479, 2010 WL 678126 (S.D. Fla. Feb. 25, 2010) ..........................17

*Kouromihelakis v. Hartford Fire Ins. Co.*,
    48 F. Supp. 3d 175 (D. Conn. 2014)...............................................................15, 17

*In re Lehman Bros. Sec. & ERISA Litig.*,
    706 F. Supp. 2d 552 (S.D.N.Y. 2010).................................................................18

iv

*Manning v. Esper*,
  No. 12-cv-1802, 2019 WL 281278 (D.D.C. Jan. 22, 2019)......................................25

*Metzger v. Aetna Ins. Co.*,
  125 N.E. 814 (N.Y. 1920)........................................................................................12

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983)....................................................................................................11

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Belco Petroleum Corp.*,
  88 F. 3d 129 (2d Cir. 1996).....................................................................................12

*Penn Warranty Corp. v. DiGiovanni*,
  810 N.Y.S.2d 807 (Sup. Ct. 2005)..........................................................................16

*Prestridge v. Williams*,
  No. 20-cv-61, 2021 WL 4948934 (D. Nev. Oct. 23, 2021).....................................25

*Rausman v. Baugh*,
  682 N.Y.S.2d 42 (App. Div. 1998)..........................................................................23

*Rivera v. Cap. One Fin. Corp.*,
  No. 151441/2018, 2018 WL 6329470 (N.Y. Sup. Ct. Dec. 4, 2018) ......................25

*Snyder v. Sony Music Ent., Inc.*,
  684 N.Y.S.2d 235 (App. Div. 1999).........................................................................25

*Wallace v. 600 Partners Co.*,
  658 N.E.2d 715 (N.Y. 1995)....................................................................................12

*Whitt v. Prosper Funding LLC*,
  No. 1:15-cv-136, 2015 WL 4254062 (S.D.N.Y. July 14, 2015)...............................12

**Statutes**

9 U.S.C. § 2.....................................................................................................................10, 11

Fed. Rule Civ. P. 12(b)(6)....................................................................................................21

**Other Authorities**

FINRA Rule 13100(b) ......................................................................................................14, 15

FINRA Rule 13100(q) ...........................................................................................................14

FINRA Rule 13100(u) ......................................................................................................14, 15

FINRA Rule 13200 ..........................................................................................................17, 18

v

FINRA Rule 13200(a)............................................................................................................14, 17

4151-3587-7951

Defendants Goldman Sachs & Co. LLC ("GS&Co.") and The Goldman Sachs Group, Inc. ("GS Group") (collectively the "Goldman Defendants") submit this Memorandum of Law in Support of their Motion to Compel Arbitration and Dismiss Proceedings Pursuant to the Federal Arbitration Act, 9 U.S.C. § 4, and in the Alternative, to Dismiss the First Amended Complaint (the "FAC") of Plaintiff David Monk ("Monk" or "Plaintiff") pursuant to Rule 12(b)(6).

## I.   <u>PRELIMINARY STATEMENT</u>

Monk, a former employee of GS&Co., has openly violated no fewer than eight agreements to arbitrate by filing the instant action with this Court. Monk signed several valid and binding arbitration agreements in connection with his employment with GS&Co. that require arbitration of this dispute. First, upon joining GS&Co., Monk signed a Uniform Application for Securities Industry Registration or Transfer ("U-4 Agreement") containing a broad agreement to arbitrate claims arising out his and GS&Co.'s "business activities." In addition, Monk executed an Employee Agreement Regarding Confidential and Proprietary Information and Materials and Non-Solicitation Agreement (the "Confidentiality Agreement"), which mandates arbitration of "any dispute or claim arising out of, based upon or relating in any way" to his employment with GS&Co. or the termination thereof. In return for valuable equity awards, Monk also executed multiple Signature Card Agreements requiring arbitration of "all claims arising out of or relating to [his] employment with [GS&Co.] or the termination thereof, or otherwise concerning any rights, obligations or other aspects of [his] employment relationship with [GS&Co.]." Finally, following his employment with GS&Co., Monk signed a Settlement Agreement with the Goldman Defendants, which requires arbitration of claims "arising out of or based upon or relating in any way to…Monk's employment or other association with GS&Co., or the termination of Monk's employment."

Monk's claims fall within the language of each of the agreements to arbitrate detailed above

because they arise out of his and GS&Co.'s "business activities" and relate to his employment with GS&Co.  Specifically, Monk's claims are based on his allegation that Jane/John Doe ("Doe"), an unnamed individual allegedly "employed by Goldman Sachs"[1], made false and defamatory statements about Monk to two employees of his new employer, BSE Global ("BSE"), and that Doe's statements resulted in his termination from BSE.  Monk alleges that "when Doe made the offending statements…Doe was acting in the course of his/her employment by Goldman Sachs" and that "any knowledge that Doe had regarding Plaintiff at the time the statements were made was obtained through Doe's employment with Goldman Sachs."  Stated another way, Monk is alleging that in connection with his/her employment with Goldman Sachs, Doe allegedly obtained information regarding Monk's activities while he was employed by GS&Co. and allegedly subsequently revealed that information regarding Monk's employment with GS&Co. to BSE.

In addition, a deposition of BSE's Chief People Officer Emerson Moore ("Moore") in this action has revealed that the relevant statements about Monk directly concern his employment with GS&Co. and the termination thereof.  Moore testified that the relevant statements were that Monk engaged in inappropriate conduct with female Goldman Sachs employees and that he was "fired for sexual harassment at Goldman Sachs."  Based on Monk's own allegations and the testimony of Moore, it is clear that Monk's claims arise out of his and GS&Co.'s "business activities" and relate to his employment with GS&Co.  Thus, the Court should order them to arbitration.

In the alternative, the Court should dismiss Monk's claims.  The Court should dismiss Monk's claim for respondeat superior against the Goldman Defendants for two reasons.  *First*, the Court should dismiss Monk's claim because under New York law, respondeat superior is not a substantive stand-alone cause of action.  *Second*, even if Monk were to plead under a respondeat

---

[1] Monk defines "Goldman Sachs" as both GS&Co. and GS Group.  Complaint ("Compl.") ¶ Intro., ECF No. 1.

superior theory of liability, a claim of defamation (rather than a stand-alone claim of respondeat superior), such pleading would be futile because Monk's allegations are insufficient to state a plausible claim.  Monk has failed to allege facts specifically identifying the person who made the allegedly defamatory statements (referring to him/her only as Doe), the persons to whom the statements were made (referring to them only as two BSE sales employees) and the time when the statements were made.  Furthermore, Monk has failed to properly plead facts supporting a theory of respondeat superior liability—his conclusory allegation that "Doe was acting in the course of his/her employment by Goldman Sachs" when he/she made the offending statements is insufficient.

The Court should also dismiss Monk's claim for tortious interference against the Goldman Defendants because: (1) Monk has failed to allege sufficient facts to establish liability under a theory of respondeat superior; and (2) the claim is derivate of his defamation allegations, which are defective for the reasons detailed above.

Finally, the Court should dismiss Monk's claims against Doe for defamation and tortious interference because upon dismissal of the Goldman Defendants, Monk will be left with a lawsuit against an unnamed defendant who he cannot serve.

## II.   FACTS

### A.   Named Parties

#### 1.   GS Group

GS Group is a leading global investment banking, securities and investment management firm that provides a wide range of financial services to a substantial and diversified client base that includes corporations, financial institutions, governments and individuals.  Declaration of Aime Hendricks ISO Motion to Compel Arbitration ("Hendricks Dec.") ¶ 3.  Although GS Group serves as a parent entity to several broker-dealer subsidiaries, it is not itself a broker-dealer and thus is

not registered with the Financial Industry Regulatory Authority ("FINRA").[2]  *Id.*

### 2.   **GS&Co.**

GS&Co., a subsidiary of GS Group, is GS Group's principal U.S. broker-dealer.  Hendricks Dec. ¶ 4.  GS&Co. is registered with FINRA and provides services that include securities brokerage, dealership and underwriting, investment banking, commodity trading and investment consulting.  *Id.*

### 3.   **David Monk**

Monk was employed by GS&Co. from 2007 until 2019 as a Private Wealth Advisor.  Hendricks Dec. ¶ 5.  As a Private Wealth Advisor in GS&Co.'s Consumer & Investment Management Division[3], Monk was responsible for creating and managing comprehensive wealth management plans for ultra high net worth individuals and families, as well as select institutions, including foundations and endowments.  *Id.*

Monk was registered with FINRA or its predecessor entities—the National Association of Securities Dealers ("NASD") and the member regulation operations of the New York Stock Exchange ("NYSE")—during his employment with GS&Co.  *Id.* ¶ 6, Ex. A § 4.  Prior to joining GS&Co., Monk was registered with the NASD and NYSE as an employee of Credit Suisse Securities (USA) LLC and Pershing LLC a/k/a Donaldson, Lufkin & Jenrette Securities Corporation.  *Id.*, Ex. A § 12, pp. 16-19.

### B.   **Monk's Arbitration Agreements**

Plaintiff signed several arbitration agreements in connection with his employment with GS&Co., each of which is discussed below.

---

[2] FINRA is a is a government-authorized not-for-profit organization that oversees U.S. broker-dealers. *See* https://www.finra.org/about/what-we-do (last visited October 3, 2022). "FINRA is authorized by Congress to protect America's investors by making sure the broker-dealer industry operates fairly and honestly."  *Id.*
[3] This division has been renamed the Consumer Wealth Management Division.  Hendricks Dec. ¶ 2.

4151-3587-7951

### 1.      The U-4 Agreement

Upon joining GS&Co., Monk signed the U-4 Agreement, which provides in Section 15A:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and
> my *firm*, or a customer, or any other person, that is required to be arbitrated under
> the rules, constitutions, or by-laws of the SROs indicated in Section 4 (SRO
> REGISTRATION) as may be amended from time to time….

Hendricks Dec. ¶ 7, Ex. A § 15A (emphasis in original).

Concurrently with his execution of the U-4 Agreement, Monk executed a disclosure

statement regarding arbitration pursuant to which he reacknowledged his agreement to arbitrate

pursuant to the U-4 Agreement and affirmed his understanding of the arbitration process.  *Id.* ¶ 8,

Ex. B.

### 2.      The Confidentiality Agreement

On May 29, 2007, Monk signed the Confidentiality Agreement, which provides:

> [A]ny dispute or claim arising out of, based upon or relating in any way to this
> Agreement, or to your employment at Goldman Sachs[4] or the termination of your
> employment, will be settled and finally determined by arbitration.   Any such
> arbitration will be conducted in New Yolk City before the American Arbitration
> Association or any other organization referred to in the arbitration provisions of
> any uniform application for Securities Industry Registration you have signed.[5]

Hendricks Dec. ¶ 9, Ex. C ¶ 11.

### 3.      The Signature Card Agreements

Part of Monk's discretionary compensation while employed by GS&Co. was in the form

of Restricted Stock Units ("RSUs") of GS Group common stock.  Hendricks Dec. ¶ 10.  These

RSUs are granted under The Goldman Sachs Stock Incentive Plan (the "SIP"), which is amended

from time to time.  *Id.*

---

[4] "Goldman Sachs" is defined by the Confidentiality Agreement as GS&Co. or any of its subsidiaries or affiliates.
Hendricks Dec., Ex. C.
[5] As described in Section II(A)(3), Monk was registered with FINRA and its predecessor entities.

4151-3587-7951

Monk was awarded RSUs under the 2013 Amended and Restated SIP at the end of calendar years 2013 and 2014 and RSUs under the 2015 Amended and Restated SIP at the end of calendar years 2015, 2016, and 2017 (collectively the "Year-End Awards").  *Id.* ¶ 10.

Monk voluntarily elected to accept these Year-End awards and abide by certain terms and conditions.  *Id.* ¶ 11.  As part of these terms and conditions, Monk was required to execute (and did, in fact, execute electronically) the Signature Card Agreements, which provide:

> If I am employed in the U.S. or if I am otherwise subject to U.S. Federal, State, or local employment laws[6], I...agree to arbitrate, in accordance with the SIP-related arbitration procedure[7] and to the fullest extent permitted by law, all claims arising out of or relating to my employment with the Firm[8] or the termination thereof, or otherwise concerning any rights, obligations or other aspects of my employment relationship with the Firm (collectively, 'Employment-Related Matters')....

*Id.* ¶ 11, Exs. F-J ¶ 1.

### 4.   **The Settlement Agreement**

Following the termination of his employment with GS&Co., Monk filed a Statement of Claim with FINRA Dispute Resolution (the "Arbitration"), in which he alleged that GS&Co. and GS Group improperly cancelled certain of his RSUs.  Hendricks Dec. ¶ 12.

In October 2021, Monk, GS&Co. and GS Group entered into the Settlement Agreement resolving the claims made in the Arbitration.  *Id.* ¶ 12.  The Settlement Agreement provides the following with respect to arbitration:

> To the fullest extent permitted by law, any dispute, controversy or claim between or among Monk and any party released by Monk herein, arising out of or based upon or relating in any way to this Agreement, or to Monk's employment or other association with GS&Co., or the termination of Monk's employment, will be settled

---

[6] Monk was employed by GS&Co. in the United States—specifically, New York City, New York.  Hendricks Dec. ¶ 5.

[7] The SIP-related arbitration procedure, which is detailed in Section 3.17 of the 2013 and 2015 Amended and Restated SIPs, provides for arbitration with NYSE—FINRA's predecessor entity.  Hendricks Dec. ¶ 10, Exs. D, E.  The Signature Card Agreements provide that all references to the NYSE in Section 3.17 shall be read as references to FINRA.  Hendricks Dec., Exs. F-J ¶ 1.

[8] "Firm" is defined in the 2013 and 2015 Amended and Restated SIPs as GS Group and its subsidiaries and affiliates, which includes GS&Co.  Hendricks Dec. ¶ 4, Exs. D, E §§ 1.2.26; 1.2.29.

- 6 -

by arbitration.  Any such arbitration will be conducted in New York City before the Financial Industry Regulatory Authority ('FINRA') in accordance with applicable FINRA rules then in effect.

*Id.* ¶ 12, Ex. L ¶ 8.

### C.     Monk's Allegations

On July 15, 2022, in open violation of his agreements to arbitrate, Monk filed the instant lawsuit against GS&Co., GS Group and Doe, asserting the following causes of action: Count I: Against Doe for Libel/Trade Libel/Injurious Falsehood; Count II: Against GS&Co. and GS Group for Respondeat Superior; and Count III Against Defendants for Tortious Interference.  Compl. ¶¶ Intro., 24-41, ECF No. 1. On July 21, 2022, Monk filed the FAC, amending his original complaint to allege the citizenship of the members of GS&Co.  FAC ¶ 5, ECF No. 11.  The causes of action of the original complaint remained unchanged.  In support of his claims, Monk alleges the following:[9]

Plaintiff Monk worked for Goldman Sachs from 2007 through 2019 as a Private Wealth Advisor.  FAC ¶ 1.  Following his departure from Goldman Sachs, Plaintiff was offered and accepted a position as Senior Vice President, Premium Development of BSE, the corporate entity for the Brooklyn Nets, the Long Island Nets, the Barclays Center, Nets GC and the New York Liberty.  *Id.*  After only two months, Plaintiff's employment with BSE was terminated.  *Id.*  Plaintiff alleges that the termination emanated from false and defamatory statement(s) made by Doe, in the course of Doe's employment with Goldman Sachs.  *Id.*  Specifically, Monk alleges:

In March 2022, during an event at the Barclays Center, Plaintiff visited the Goldman Sachs suite and greeted various individuals, including a Goldman Sachs Private Wealth Management employee, whom he knew from his prior employment at Goldman Sachs.  *Id.* ¶ 17.  Within two

---

[9] The Goldman Defendants reserve all rights to dispute Monk's allegations.

4151-3587-7951

days of having visited the Goldman Sachs suite, Plaintiff alleges that he was approached by Moore, the Chief People Officer for BSE, who advised him that a Goldman Sachs employee called two BSE sales employees and made troubling statements. *Id.* ¶ 18.

> During the aforementioned conversation Moore also stated to Plaintiff the following:
>
> a. two women from BSE stated that they did not feel comfortable working with Plaintiff;
> b. the two women told Moore that they received a call from a person at Goldman Sachs who stated to them that 'David Monk is a sexual predator. He likes to get women drunk on booze cruises.'
> c. when Plaintiff asked who the women were, Moore refused to identify them;
> d. when Plaintiff asked Moore to identify the person from Goldman Sachs who made the call to the BSE women, Moore stated, 'I can't tell you.'

*Id.* ¶ 19.

Plaintiff and Moore discussed what was conveyed by the two women from BSE at which time Moore said to Plaintiff that it is just a rumor and there is nothing to do. *Id.* ¶ 18 [sic]. Approximately five weeks later, Plaintiff was again approached by Moore who stated to Plaintiff "the rumor has gone unabated, and we do not see a path for you here going forward," and advised Plaintiff that his employment with BSE was terminated effective May 10, 2022. *Id.* ¶ 20 [sic].

### D. **Moore's Deposition**

On September 19, 2022, Monk took Moore's deposition in this action.[10] Moore testified, in relevant part, to the following:

Monk was hired by BSE in early 2022. Declaration of Mark R. Thompson ISO Motion to Compel ("Thompson Dec.") ¶ 4, Ex. B (Moore Depo. 12:2-20). In late March 2022, Moore received a call from BSE employee Mandy Gutmann ("Gutmann") regarding an issue raised by one of her direct reports, Margaret Bourne ("Bourne"). *Id.* (Moore Depo. 16:17-17:23). Following

---

[10] This deposition occurred pursuant to a third-party deposition and document subpoena issued by Monk to Moore on August 9, 2022. Thompson Dec. ¶ 3, Ex. A.

the call from Gutmann, Moore met with Bourne and asked her to describe what her issue was.  *Id*. (Moore Depo. 18:7-21:4).  Bourne informed Moore that she was uncomfortable being alone with Monk because he had invaded her personal space and because he overshares.  *Id*.  Specifically, Borune stated that Monk had invaded her personal space by reaching down and fixing her collar. *Id*.  She also mentioned that he stands too close when he talks.  *Id*.  With respect to oversharing, Bourne stated to Moore that Monk had shown an employee a video of his wife doing Pilates or yoga upon their first meeting and told a junior employee that he had caught his son having sex with his girlfriend.  *Id*.  Bourne further shared that she was aware of a rumor that Monk engaged in inappropriate conduct with female Goldman Sachs[11] employees on a "booze cruise."  *Id*.

Shortly after his meeting with Bourne, Moore met with Monk.  *Id*. (Moore Depo. 26:20-27:2). Without identifying Bourne, Moore informed Monk that a BSE employee complained that he had invaded their personal space and that he overshares.  *Id*. (Moore Depo. 27:17-29:9).  Moore also told Monk that he had been made aware of a rumor that Monk engaged in inappropriate conduct with female Goldman Sachs employees on a "booze cruise."  *Id*.  Monk told Moore that the rumor was not true because he had nothing to do with a "booze cruise."  *Id*.  Monk then gave his version of the story regarding what happened at Goldman Sachs.  *Id*.  In defense of his actions regarding personal space and oversharing, Monk blamed these actions on "cultural differences" or "who he was as a person."  *Id*. (Moore Depo. 33:3-16).  Moore concluded the meeting by warning Monk that his behavior needed to be "above[]board" going forward.  *Id*. (Moore Depo. 32:17-33:2).

On May 6, 2022, Moore received an email from BSE employee Amos Varon ("Varon") detailing a second complaint made against Monk by another BSE employee, Kara Walsh

---

[11] Monk's counsel referred to GS&Co. and GS Group collectively as "Goldman Sachs" during the deposition. Thompson Dec., Ex. B (Moore Depo. 8:14-20).

4151-3587-7951

("Walsh").  *Id.* ¶ 5, Ex. B (Moore Depo. 33:17-35:4; 55:2-6), Ex. C.  As recounted in Varon's email, Walsh told Varon that she had heard a rumor within BSE's office that Monk was "fired for sexual harassment at Goldman Sachs."  *Id.*[12]  As also detailed in Varon's email, Walsh shared with Varon that she did not feel comfortable going to any potential client lunch or dinner meetings with Monk away from the office.  *Id.*, Ex. B (Moore Depo. 35:11-36:8), Ex. C.

Following receipt of Walsh's complaint, Moore met with Monk and informed him that a second employee had come forward claiming they were uncomfortable being alone with him and that his employment was being terminated.  *Id.*, Ex. B (Moore Depo. 44:12-22; 45:6-46:6).

## III.   ARGUMENT

### A.   The Court Should Grant the Goldman Defendants' Motion to Compel Arbitration

For the reasons detailed below, the Court should compel Monk's claims to arbitration under the terms of the U-4 Agreement, the Confidentiality Agreement, the Signature Card Agreements and the Settlement Agreement (collectively, the "Arbitration Agreements") pursuant to the Federal Arbitration Act ("FAA").

### B.   The FAA Applies to the Arbitration Agreements

As an initial matter, the FAA applies to the Arbitration Agreements.  The FAA applies to any arbitration agreement contained in "a contract evidencing a transaction involving commerce." 9 U.S.C. § 2.  This statutory language "signals Congress' intent to exercise its Commerce Clause powers to the full."  *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273 (1995). Accordingly, the FAA covers any contract so long as "in the aggregate" the kind of activity governed by the contract "bear[s] on interstate commerce in a substantial way."  *Citizens Bank v.*

---

[12] Neither Bourne nor Walsh used the term "sexual predator" when describing the rumor.  Thompson Dec., Ex. B (Moore Depo. 16:17-17:2; 31:10-32:5).

*Alafabco, Inc.*, 539 U.S. 52, 57 (2003) (per curiam).

The FAA applies to the Arbitration Agreements because they each were made pursuant to a transaction that bears on interstate commerce in a substantial way.  Specifically, the Arbitration Agreements were made pursuant to transactions regarding Monk's employment with GS&Co., a global investment bank, as a Private Wealth Advisor where he created and managed comprehensive wealth management plans for ultra high net worth individuals, families, and institutions located in New York as well as other states.  Hendricks Dec. ¶¶ 5, 7-9, 11, 12.  In addition, as a Private Wealth Advisor, Monk oversaw and managed financial transactions that were interstate and international in nature.  *Id*. ¶ 5.  Moreover, language in both the Signature Card Agreements and the Settlement Agreement specifically provide for the application of the FAA. *Id.*, Exs. F-J ¶ 1, Ex. L ¶ 8.

Because the Arbitration Agreements are agreements "evidencing a transaction involving commerce" and the agreements specifically provide for application of the FAA, the FAA applies.

## C.    Monk's Claims Are Subject to Arbitration

The FAA provides that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  Enacted "in response to widespread judicial hostility to arbitration agreements," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011), the FAA requires courts to enforce "a liberal federal policy favoring arbitration agreements."  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (internal quotation marks omitted).

The FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or a[]…defense to arbitrability."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24-25 (1983).  A dispute is arbitrable under

- 11 -

the FAA when: (1) there exists a valid agreement to arbitrate under the contract in question; and (2) the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Belco Petroleum Corp.*, 88 F. 3d 129, 135 (2d Cir. 1996). If these two conditions are met, then the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that the district courts *shall* direct the parties to proceed to arbitration." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). As set forth below, both of these conditions for arbitrability are satisfied.

### 1.   <u>Monk Entered into Several Valid Agreements to Arbitrate</u>

The first condition for arbitrability under the FAA is satisfied here because it is indisputable that Monk has entered into several valid agreements to arbitrate. Under New York law, "there is a heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties." *Chimart Assocs. v. Paul*, 489 N.E.2d 231, 234 (N.Y. 1986) (internal quotation marks and alteration omitted). Indeed, "in the absence of fraud or other wrongful act on the part of another contracting party, a party 'who signs or accepts a written contract…is conclusively presumed to know its contents and to assent to them.'" *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (quoting *Metzger v. Aetna Ins. Co*., 125 N.E. 814, 817 (N.Y. 1920)).[13]

This presumption of validity applies with "even greater force" when the agreement at issue, like the Arbitration Agreements here, involve sophisticated parties. *Wallace v. 600 Partners Co*., 658 N.E.2d 715, 717 (N.Y. 1995). As a financial professional with years of experience who spent

---

[13] This is as true for electronic agreements and signatures as it is for their traditional counterparts. *See e.g.*, *Whitt v. Prosper Funding LLC*, No. 1:15-cv-136, 2015 WL 4254062, at *4 (S.D.N.Y. July 14, 2015) (compelling arbitration and finding electronic agreements are "valid and enforceable contracts").

his employment at GS&Co. advising ultra high net worth clients who have complicated investment profiles and portfolios and as a person who has obtained an undergraduate degree from the University of Pennsylvania and a law degree from Pepperdine Law School (Hendricks Dec., Ex. A § 12; FAC ¶ 1), Monk unquestionably understood the meaning of and implications of the Arbitration Agreements he signed.  *See Berger v. Cantor Fitzgerald Sec.*, 967 F. Supp. 91, 94 (S.D.N.Y. 1997) (compelling arbitration of securities dealer's claim against brokerage firm and rejecting argument "that he lacked the sophistication required to understand the meaning of the arbitration clause").[14]

To defeat the FAA's presumption of validity, Monk would have to come forward with sufficient evidence to show that the Arbitration Agreements were somehow the result of fraud, duress, or unconscionability.  But given Monk's level of experience and education, it is inconceivable that he could make such a showing here.

### 2.    Monk's Claims Fall within the Scope of the Arbitration Agreements

The second condition for arbitrability under the FAA is satisfied here because Monk's claims fall within the scope each of the Arbitration Agreements.

### a.    Monk's Claims Fall within the Scope of the U-4 Agreement

Monk's claims fall within the scope of the U-4 Agreement.  As detailed above, the U-4 Agreement requires arbitration of "any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs indicated in Section 4 (SRO REGISTRATION) as may be amended from time to time."  Pursuant to Section 4 of the U-4 Agreement, Monk registered with NASD and NYSE—FINRA's predecessor entities.  Hendricks Dec., Ex. A § 4.

---

[14] Notably, Monk was represented by counsel in the arbitration and in the negotiation and execution of the Settlement Agreement.  Hendricks Dec. ¶ 12.

4151-3587-7951

FINRA Rule 13200(a) provides that "[e]xcept as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among: •Members; •Members and Associated Persons; or •Associated Persons."  Thompson Dec. ¶ 6, Ex. D.  Thus, to determine whether a dispute falls within FINRA Rule 13200(a) the court must answer two questions: (1) whether the instant dispute is "between or among Members; Members and Associated Persons; or Associated Persons"; and (2) whether it arises "out of the business activities of a member or an associated person."  *See Greenberg v. Ameriprise Fin. Servs., Inc*., No. 15-cv-3589, 2016 WL 3526025, at *6 (E.D.N.Y. Mar. 31, 2016).

The answer to the first question is yes.  The instant dispute is between a Member and an Associated Person.  FINRA Rule 13100(q) defines the term "Member" to include "any broker or dealer admitted to membership in FINRA, whether or not the membership has been terminated, suspended, cancelled, revoked, the member has been expelled or barred from FINRA or the member is otherwise defunct…."  Thompson Dec. ¶ 7, Ex. E.  GS&Co. is currently a Member of FINRA and has been since 2007.  Hendricks Dec. ¶ 4.  Prior to 2007, GS&Co. was a member of FINRA's predecessor entities—the NYSE and NASD.  *Id.*  Thus, GS&Co. is a "Member" as defined by FINRA Rule 13100(q).

FINRA Rule 13100(b), (u) defines "Associated Person" to include "[a] natural person who is registered or has applied for registration under the Rules of FINRA."  Thompson Dec., Ex. E.  FINRA Rule 13100(u) further provides that "[f]or purposes of the Code, a person formerly associated with a member is a person associated with a member."  *Id.*  Monk was a member of FINRA (or its predecessor entities) throughout his employment with GS&Co.  Hendricks Dec. ¶ 6.  Furthermore, prior to joining GS&Co., Monk was registered with the NASD and NYSE as an

- 14 -

employee of other broker dealers.  *Id*., Ex. A § 12, pp. 16-19.  Thus, Monk is an "Associated Person" as defined by FINRA Rule 13100(b), (u).

The answer to the second question—whether the instant dispute arises "out of the business activities of a member or an associated person" is also yes.  To determine whether Monk's claims arise out of "business activities," it is necessary to "'focus on the factual allegations in the complaint rather than the legal causes of action asserted.'"  *Christensen v. Nauman*, 73 F. Supp. 3d 405, 412 (S.D.N.Y. 2014) (quoting *Genesco, Inc. v. T. Kakiuchi & Co*., 815 F.2d 840, 846 (2d Cir. 1987)).  "[T]he Court reviews the Complaint's factual allegations mindful of the strong federal policy favoring arbitration and of its duty to construe arbitration clauses as broadly as possible." *Id*. (internal quotation marks omitted).  "If the allegations underlying the claims 'touch matters' covered by the parties' [business activities], then those claims must be arbitrated, whatever the legal labels attached to them."  *Kouromihelakis v. Hartford Fire Ins. Co*., 48 F. Supp. 3d 175, 185 (D. Conn. 2014).

The FINRA Rules do not define the term "business activities."  Courts, however, have made clear that "employment-related disputes between a FINRA member and an associated person…are 'business activities' arbitrable before FINRA."  *See Christensen*, 73 F. Supp. 3d at 412 (citing cases).  The instant dispute is an employment-related dispute between a FINRA Member—GS&Co., and an Associate Person—Monk.  Monk's claims are based on his allegations that Doe, an unnamed employee of his former employer, GS&Co., made defamatory statements to employees of BSE "intended to malign Plaintiff in his professional activities and were designed to induce others, including and specifically BSE from doing business with Plaintiff."  FAC ¶ 26. Monk alleges that "when Doe made the offending statements…Doe was acting in the course of his/her employment by Goldman Sachs" and that "any knowledge that Doe had regarding Plaintiff

- 15 -

at the time the statements were made was obtained through Doe's employment with Goldman Sachs." *Id.* ¶¶ 33-34.  Stated another way, Monk is alleging that in connection with his/her employment with Goldman Sachs, Doe allegedly obtained information regarding Monk's activities while he was employed by GS&Co. and allegedly subsequently revealed that information regarding Monk's employment with GS&Co. to BSE.

The characterization of Monk's defamation claims against Doe as "*trade* libel" (*id.* ¶¶ 1, 27 (emphasis added)), which is "the knowing publication of false and derogatory material **regarding one's business**, that is calculated to prevent others from doing business with the defamed party or otherwise interferes with one's business relationships" (*Penn Warranty Corp. v. DiGiovanni*, 810 N.Y.S.2d 807, 813 (Sup. Ct. 2005) (emphasis added)), also makes clear the alleged defamatory statements were made about Monk's "business"—*i.e.* his employment with GS&Co.—and not about his general character.

Furthermore, Moore's deposition testimony reveals that the relevant statements about Monk directly concern his employment with GS&Co. and the termination thereof.  Specifically, Moore testified that the relevant statements regarding Monk were that Monk engaged in inappropriate conduct with female Goldman Sachs employees and was "fired for sexual harassment at Goldman Sachs." Thompson Dec., Ex. B (Moore Depo. 18:7-21:4; 34:4-35:4; 55:2-6), Ex. C).

Considering Monk's allegations in the FAC and Moore's deposition testimony, it is clear that Monk's claims relate to his employment with GS&Co. and thus, arise out of his and GS&Co.'s "business activities."  The Court should order them to arbitration.

Moreover, to prove that Doe's statements were defamatory, Monk will have to establish that the alleged statements made by Doe are not true—*i.e.* that he did not engage in inappropriate

- 16 -

conduct with female Goldman Sachs employees while he was employed by GS&Co. and that he was not "fired for sexual harassment at Goldman Sachs."[15]   This proof necessarily concerns Monk's employment at GS&Co., making further clear that this dispute arises out of the "business activities" of the parties and must be arbitrated.  *Kouromihelakis*, 48 F. Supp. 3d at 185 ("The underlying dispute in the defamation claim is whether the plaintiff forged a document…while he was employed by the defendant. This dispute falls squarely within the scope of FINRA Rule 13200(a) because it 'arises out of the business activities' between the parties.").

That the alleged defamatory statements were made by Doe following the termination of Monk's employment with GS&Co. is immaterial.  Courts have compelled arbitration of claims arising from post-termination statements pursuant to FINRA Rule 13200. *See e.g.*, *Kouromihelakis*, 48 F. Supp. 3d at 185 (compelling claims for defamation and tortious interference arising out of allegations that the defendant falsely reported to FINRA, post-termination, that he had forged a document and engaged in fraud while employed by the defendant).[16]

Because the instant dispute is an employment-related dispute, it "arises out of" both GS&Co.'s "business activities" as a member and Monk's "business activities" as a an "Associated Person."

In the alternative, even assuming that the instant dispute is not an employment-related dispute (it is) and it does not arise out of the "business activities" of Monk as an "Associated Person" (it does), the parties' dispute must nevertheless be arbitrated under the FINRA Rules for

---

[15] *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (App. Div. 1999) (holding that the elements of a claim for defamation include: "a false statement").

[16] *See also Johnson v. Charles Schwab & Co*., No. 09-CV-81479, 2010 WL 678126, at *4 (S.D. Fla. Feb. 25, 2010) (defamation claim arising out of cease and desist letter by plaintiff's former employer to plaintiff's current employer, sent seven years after plaintiff voluntarily resigned, arose out of the business activities and relationship and was thus subject to arbitration).

the independent reason that, as alleged, it arises out of the "business activities" of GS&Co. [17]   Here, Monk claims that GS&Co. and GS Group are liable for Doe's alleged defamatory statements pursuant to the doctrine of respondeat superior and that "when Doe made the offending statements…Doe was acting in the course of his/her employment by Goldman Sachs."  Given these allegations, Monk cannot dispute that his claims that Doe defamed him arise out of GS&Co.'s "business activities."  *Cf. In re Lehman Bros. Sec. & ERISA Litig.*, 706 F. Supp. 2d 552, 560 (S.D.N.Y. 2010) ("[Employee] allegedly is liable under theories of respondeat superior and as a supervisor or control person for those [employer's] activities. This manifestly is 'in connection with [employer's] business activities.'"). [18]

Because the U-4 Agreement is a valid agreement to arbitrate and Monk's claims fall within the scope of the agreement, this Court should compel Monk's claims against GS&Co. to arbitration.  The Court should also compel Monk's claims against GS Group and Doe to arbitration because they are entirely derivative of his claims against GS&Co. and because Monk does not distinguish claims between his employer, GS&Co. and its non-member parent, GS Group (Compl. ¶ Intro.).  *See Greenberg*, 2016 WL 3526025, at *7 (compelling claims against non-FINRA member defendant to arbitration because plaintiff's claims against it were "entirely derivative of his claims" against defendants registered with FINRA and because plaintiff treated the defendants interchangeably in his complaint).

    **b.**    **<u>Monk's Claims Fall within the Scope of the Confidentiality Agreement, the Signature Card Agreements and the Settlement Agreement.</u>**

---

[17] Depending on the identity of Doe, he/she may be an "Associated Person."  If so, then then Monk's claims would also be arbitrable for the additional and independent reason that they would arise out of his/her "business activities" as an "Associated Person."

[18] *See also Bucy v. Edward Jones & Co.*, 445 P.3d 812, 827-28 (Mont. 2019) (holding that alleged post-employment defamatory statements by plaintiff's former employer, Edward Jones, "all directly regard and relate to the conduct of Edward Jones' business activities" under FINRA Rule 13200).

4151-3587-7951

Monk's claims also fall within the scope of the Confidentiality Agreement, the Signature Card Agreements and the Settlement Agreement.   As detailed above, the Confidentiality Agreement contains broad language requiring arbitration of "any dispute or claim arising out of, based upon or relating in any way to" Monk's employment at GS&Co. or the termination of his employment.   The Signature Card Agreements similarly provide for arbitration of "all claims arising out of or relating to" Monk's employment with GS&Co. or the termination thereof or concerning any rights, obligations or other aspects of his employment relationship with GS&Co. Finally, the Settlement Agreement provides that "[t]o the fullest extent permitted by law, any dispute, controversy or claim between or among Monk and any party released by Monk herein[19], arising out of or based upon or relating in any way to this Agreement, or to Monk's employment or other association with GS&Co., or the termination of Monk's employment, will be settled by arbitration."

Courts that have considered arbitration clauses nearly identical to the ones at issue here have concluded that the clauses should be interpreted broadly to cover any disputes arising out of the employment relationship.   *See Arakawa v. Japan Network Grp*., 56 F. Supp. 2d 349, 353 (S.D.N.Y. 1999) (collecting cases).   For the reasons detailed in Section III(C)(2)(a) above, Monk's claims arise out of the employment relationship between Monk and GS&Co. and thus, should be compelled to arbitration.   *See Balan v. Tesla, Inc*., 840 F. App'x 303, 304 (9th Cir. 2021) (compelling defamation claims based on employer's various post-termination statements about former employee pursuant to parties' arbitration agreement covering claims "arising from or relating to" employment, or the termination thereof).[20]

---

[19] Parties released by the Settlement Agreement include GS&Co. and GS Group.  Hendricks Dec., Ex. L ¶ 2.
[20] *See also Feinberg v. Oppenheimer & Co.*, 658 F. Supp. 892, 893 (S.D.N.Y. 1987) (finding arbitration applicable to defamation claim based upon firm's reasons for employee termination because dispute pertained to employment relationship).

- 19 -

Because the Confidentiality Agreement, the Signature Card Agreements and the Settlement Agreement are valid agreements to arbitrate and Monk's claims fall within the scope of these agreements to arbitrate, this Court should compel Monk's claims against GS&Co. to arbitration.

The Court should compel Monk's claims against GS Group and Doe to arbitration for two additional reasons.  First, as detailed above, Monk's claims against GS Group and Doe are entirely derivative of his claims against GS&Co. and Monk does not distinguish claims between GS&Co. and GS Group (see Compl. ¶ Intro.).  *See Greenberg*, 2016 WL 3526025, at *7.  Second, the Confidentiality Agreement, the Signature Card Agreements and the Settlement Agreement each contain language making clear that Monk's claims against GS Group and Doe also belong in arbitration.   Specifically, the Confidentiality Agreement provides that "this Agreement is enforceable by the particular Goldman Sachs entity with whom you are employed as well as by an affiliate thereof as a third party beneficiary" and the Signature Card Agreements provide for arbitration of "**all claims** arising out of or relating to [Monk's] employment with [GS&Co.] or the termination thereof" irrespective of whom the claims are brought against.  Hendricks Dec., Ex. C ¶ 11; Ex. F-J ¶  1 (emphasis added).[21]

Finally, the Settlement Agreement's arbitration provision specifically provides that it covers "any dispute, controversy or claim between or among Monk and any party released by Monk herein", which includes GS Group and Doe (*see* Hendricks Dec., Ex. L ¶¶ 2, 8), and also requires arbitration of covered claims "irrespective of whether GS&Co. is or would be a party to any such arbitration (e.g., if he elects to pursue a claim against another employee, including Monk's manager)."  *Id*. ¶ 8.

---

[21] The 2017 Signature Card Agreement further makes clear that arbitration of claims is required "irrespective of whether the Firm is or would be a party to any such arbitration (*e.g.*, if [Monk] elect[s] to pursue a claim against another employee, including [Monk's] manager…)."  Hendricks Dec., Ex. J ¶ 1.

### D.     The Court Should Grant the Goldman Defendants' Motion to Dismiss

For all the reasons set forth above, the Court should grant the Goldman Defendants' Motion to Compel Arbitration and Dismiss Proceedings Pursuant to the FAA.  In the alternative, for the reasons detailed below, the Court should grant the Goldman Defendants' Motion to Dismiss the FAC pursuant to Rule 12(b)(6).

### 1.     Applicable Legal Standard

To survive a motion under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  "[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks omitted).

### 2.     The Court Should Dismiss Monk's Claim Against the Goldman Defendants for Respondeat Superior

In Count II of the FAC, Monk asserts a claim for respondeat superior based on Doe's alleged defamatory statements to the BSE employees. Monk's claim for respondeat superior should be dismissed for two reasons—namely: (1) respondeat superior is not a substantive stand-alone cause of action; and (2) even if Monk were to plead under a respondeat superior theory of liability, a claim for defamation (rather than a stand-alone claim of respondeat superior), such pleading would be futile because Monk's allegations are insufficient to state a plausible claim.

#### a.     The Court Should Dismiss Monk's Claim for Respondeat Superior Because It Is Not a Substantive Cause of Action

Monk's claim for respondeat superior should be dismissed because "[u]nder New York law…respondeat superior does not stand alone as a substantive cause of action." *Jain v. City of*

*New York*, No. 20-CV-5442, 2021 WL 6064204, at *3 (S.D.N.Y. Dec. 22, 2021) (J. Furman) (internal quotation marks and italics omitted).[22]  Because a claim of respondeat superior does not stand alone as a substantive cause of action, Count II of the FAC should be dismissed.

> **b.**  **The Court Should Dismiss Monk's Claim for Respondeat Superior Because Monk's Allegations Are Insufficient to State a Plausible Claim**

Even if Monk were to plead under a respondeat superior theory of liability, a claim for defamation (rather than a stand-alone claim of respondeat superior), such a pleading would be futile because Monk's allegations are insufficient to state a plausible claim.

First, Monk has failed to plead facts sufficient to state a plausible claim of defamation.  To state a claim for defamation, courts have held in this Circuit that "a plaintiff must identify: (1) the allegedly defamatory statements; (2) the person who made the statements; (3) the time when the statements were made; and (4) the third parties to whom the statements were published." *Ben Hur Moving & Storage, Inc. v. Better Bus. Bureau of Metro. N. Y., Inc*., No. 08-cv-6572, 2008 WL 4702458, at *5 (S.D.N.Y. Oct. 3, 2008) (citing cases).  Here, Monk has failed to specifically identify the person who made the allegedly defamatory statements (referring to him/her only as Doe), the persons to whom the statements were made (referring to them only as two BSE sales employees) and the time when the statements were made.  *Id.* at *5 ("[T]he plaintiff does not state with sufficient particularity what [the alleged defamatory] statements were, when they were made, by whom they were made, and to whom they were made.  The defamation claim…must, therefore, be dismissed….").

Second, Monk has failed to plead facts sufficient to state a theory of liability under the

---

[22] *See also Biswas v. City of New York*, 973 F. Supp. 2d 504, 540 (S.D.N.Y. 2013) (same); *Biberaj v. Pritchard Indus., Inc*., No. 08-cv-07993, 2009 WL 10738222, at *3 (S.D.N.Y. Sept. 28, 2009) ("Respondeat superior is a theory of liability and not a stand-alone cause of action.") (underlining omitted).

doctrine of respondeat superior. "Under New York law, an employer can be held liable for its

subordinates' statements under the theory of respondeat superior if those statements were made in

the course of performance of the employee's duties." *Ello v. Singh*, 531 F. Supp. 2d 552, 581

(S.D.N.Y. 2007) (citing *Rausman v. Baugh*, 682 N.Y.S.2d 42, 43 (App. Div. 1998).

> Although '[t]here is no single mechanical test to determine whether at a particular
> moment an employee is engaged in the employer's business [,]', the following
> factors have been identified as important to the inquiry: (1) whether the employee's
> act fell within the discretion and control of the employer; (2) whether the employee
> acted under the express or implied authority of the employer; (3) whether the
> employee's act was in furtherance of the employer's interests; (4) whether the
> employee's acts were in the 'discharge of duty' to the employer; (5) whether the
> act was in execution of the employer's orders or part of the work assigned by the
> employer; and (6) whether the acts were 'so closely connected' with what the
> employee was hired to do, and 'so fairly and reasonably incidental to it, that they
> may be regarded as methods, even though quite improper ones, of carrying out the
> objectives of employment.'

*Ello*, 531 F. Supp. 2d at 582 (citation omitted) (quoting *Rausman*, 682 N.Y.S.2d at 43).

Here, in support of his claim for respondeat superior, Monk has alleged no specific facts to

implicate the six factors above and has only alleged in conclusory fashion the following: "[u]pon

information and belief, when Doe made the offending statements…, Doe was acting in the course

of his/her employment by Goldman Sachs." FAC ¶ 33.  This conclusory allegation is not enough

to implicate any of the six factors identified above.  *Ello*, 531 F. Supp. 2d at 582 (dismissing

plaintiff's claims for failing to plead facts sufficient to implicate the respondeat superior factors);

*see also Doe v. Alsaud*, 12 F. Supp. 3d 674, 678 (S.D.N.Y. 2014) (dismissing plaintiff's claim for

respondeat superior, in part, because plaintiff failed to plead non-conclusory facts demonstrating

that the employee's conduct furthered the employer's business interests and were part of the

employee's job responsibilities).

For the reasons detailed above, even if Monk were to plead under a respondeat superior

theory of liability, a claim for defamation (rather than a stand-alone claim of respondeat superior),

- 23 -

such a pleading would be futile because his allegations are insufficient to state a claim.

**3.      The Court Should Dismiss Monk's Claim Against the Goldman Defendants for Tortious Interference**

In Count III of the FAC, Monk asserts a claim against all Defendants for tortious interference alleging that but for Doe's alleged defamatory statements "he would still be employed by BSE, and, if not employed by BSE would be able to secure other employment based upon his experience, reputation and ability in the industry."   FAC ¶ 38.   Monk's claim for tortious interference against the Goldman Defendants should be dismissed for two reasons.

*First*, Monk's claim for tortious interference against the Goldman Defendants based on Doe's statements should be dismissed because as described above in Section III(D)(2)(b), Monk has failed to allege sufficient facts to establish liability under a theory of respondeat superior. *Second*, Monk's claim for tortious interference against the Goldman Defendants should be dismissed because it is derivate of his allegations of defamation, which are defective for the reasons detailed above.   "The New York Court of Appeals has explained that, 'as a general rule, a defendant's conduct must amount to a crime or an independent tort' in order to amount to tortious interference with a prospective economic advantage."[23] *Friedman v. Coldwater Creek, Inc*., 321 F. App'x 58, 60 (2d Cir. 2009) (quoting *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004)). "A defendant who has not committed a crime or independent tort or acted solely out of malice may nevertheless be liable if he has employed 'wrongful means,'" which include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions" and "extreme and unfair economic pressure." *Id.*

---

[23] For purpose of this Motion, the Goldman Defendants assume that Monk's claim for "tortious interference" is for tortious interference with prospective economic advantage rather than tortious interference with contract considering that Monk has failed to plead the existence of a valid contract with a third party.  *AREP Fifty-Seventh, LLC v. PMGP Assocs., L.P*., 981 N.Y.S.2d 406, 407 (App. Div. 2014) ("To establish a claim of tortious interference with contract, the plaintiff must show the existence of its valid contract with a third party….") (internal quotation marks omitted).

- 24 -

Here, the only independent tort or "wrongful means" alleged here are the allegations concerning the alleged defamation by Doe, which are insufficient to state a claim for the reasons detailed above.  Because Monk's claim for tortious interference is derivative of his claim for defamation, it must be dismissed.[24]

### 4.   The Court Should Dismiss Monk's Claims Against Doe

The Court should dismiss the claims against Doe because upon dismissal of the Goldman Defendants, Monk will be left with a lawsuit against no named defendants.  Absent a named defendant, Monk cannot seek discovery against any party to identify Doe and thus, cannot serve her, precluding him from litigating the case.[25]

## IV.   CONCLUSION

The Goldman Defendants respectfully request that the Court compel Monk's claims to arbitration or, the alternative, dismiss the FAC with prejudice.

---

[24] *See Snyder v. Sony Music Ent., Inc.*, 684 N.Y.S.2d 235 (App. Div. 1999) (dismissing plaintiff's claim for tortious interference because the only evidence of wrongful means was of slander which was found not have occurred); *Rivera v. Cap. One Fin. Corp.*, No. 151441/2018, 2018 WL 6329470, at *6 (N.Y. Sup. Ct. Dec. 4, 2018) (dismissing cause of action for tortious interference based on "wrongful means" derived from defamation claims because the defamation claims were plead with insufficient specificity).

[25] *See Prestridge v. Williams*, No. 20-cv-61, 2021 WL 4948934, at *5 (D. Nev. Oct. 23, 2021) ("Prestridge has alleged that claim only against Doe defendants.  Absent a named defendant, Prestridge cannot have his Second Amended Complaint served on any person, precluding him from litigating this claim."); *Manning v. Esper*, No. 12-cv-1802, 2019 WL 281278, at *22 (D.D.C. Jan. 22, 2019) (dismissing claims against Doe defendants: "[T]he dismissal of all claims against Federal Defendants means that there is no one against whom to serve expedited discovery. Plaintiffs are left with a lawsuit against unnamed people in exclusively personal capacities.").

4151-3587-7951

Dated: New York, NY
       October 6, 2022

Respectfully submitted,


By: */s/ Jill L. Rosenberg*
Jill L. Rosenberg
Mark R. Thompson
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Tel:  (212) 506-5000
Fax: (212) 506-5151
jrosenberg@orrick.com
mthompson@orrick.com

*Attorneys for Defendants Goldman Sachs & Co.*
*LLC and The Goldman Sachs Group, Inc.*