UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
                                             :

DAVID MONK,                                 :

                    Plaintiff,          :

                                    :                   22-CV-6056 (JMF)

          -v-                        :

                                    :                 OPINION AND ORDER

GOLDMAN SACHS & CO. LLC et al.,        :

                                    :

                    Defendants.     :

                                    :
----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Plaintiff David Monk used to work for Defendant Goldman Sachs & Co. LLC

("GS&Co.").  He brings this suit against GS&Co.; its parent the Goldman Sachs Group, Inc.

("GS Group" and, together with GS&Co., the "Goldman Defendants"); and Jane/John Doe,

identified as an employee of the Goldman Defendants.  He alleges that Defendants defamed him

and tortiously interfered with his employment — specifically, by getting him fired from the job

he held after working at GS&Co.  The Goldman Defendants now move to compel arbitration,

invoking no fewer than eight arbitration agreements that Monk indisputably entered into during

or after his employment with GS&Co.  *See* ECF No. 22 ("Defs.' Mem."), at 13-20.[1]  The

primary question presented is whether Monk's claims fall within the scope of these agreements.

The Court concludes they do and therefore grants the Goldman Defendants' motion.

---

[1]     The Goldman Defendants move in the alternative to dismiss Monk's claims.  *See* Defs.
Mem. 21-25.  In the interests of judicial economy, the Court deferred further briefing on the
motion to dismiss pending a ruling on the motion to compel arbitration.  *See* ECF No. 27.

**BACKGROUND**

The relevant facts are taken from the Amended Complaint, *see* ECF No. 11 ("Am.

Compl."), affidavits submitted in connection with the Goldman Defendants' motion, and a

deposition taken by Monk.  In considering a motion to compel arbitration, "courts apply a

standard similar to that applicable for a motion for summary judgment," deciding whether there

is an issue of fact as to the making of the agreement based on "all relevant, admissible evidence

submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and

admissions on file, together with affidavits."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229

(2d Cir. 2016) (cleaned up).

**A.  Monk's Allegations**

Monk was employed as a private wealth advisor at GS&Co. from 2007 until 2019.  *See*

Am. Compl. ¶ 1.  On February 17, 2022, Monk was offered and accepted a position at BSE

Global ("BSE"), the corporate entity for the Brooklyn Nets, the Long Island Nets, the Barclays

Center, Nets GC, and the New York Liberty.  *Id.*  This job entailed, among other responsibilities,

greeting customers who maintained suites at the Barclays Center.  *Id.* ¶ 14.  In March 2022,

shortly after Monk began working at BSE, he visited the Goldman Sachs suite at the Barclays

center and met with some former colleagues.  *Id.* ¶¶ 16-17.  Two days after this event, Monk was

approached by Emerson Moore, BSE's Chief People Officer.  *Id.* ¶ 18.  According to the

Amended Complaint, Moore told Monk that two female BSE employees had received a call from

a person at "Goldman Sachs"[2] who told them that "David Monk is a sexual predator.  He likes to

get women drunk on booze cruises."  *Id.* ¶¶ 18-19.  Monk alleges that Moore also told him that

---

[2]     The Amended Complaint refers to GS&Co. and GS Group collectively as "Goldman
Sachs" without differentiating between the two.  *See* Am. Compl. ¶¶ 1, 8, 10, 15-19, 32-35.

the two women did not feel comfortable working with Monk but declined to identify the women

or the Goldman Sachs person who had called them.  *Id.* ¶ 19.  In response, Moore allegedly

stated that there was "nothing to do" and that it was "just a rumor."  *Id.* ¶ 18.[3]  Approximately

five weeks later, however, Moore advised Monk that "the rumor has gone unabated, and we do

not see a path for you here going forward."  *Id.* ¶ 20.  According to the Amended Complaint,

Monk's employment with BSE was terminated effective May 10, 2022.  *Id.*

**B.  Moore's Deposition**

Monk filed this case on July 15, 2022.  On September 19, 2022, he took Moore's

deposition.  *See* ECF No. 24 ("Thompson Decl."), ¶¶ 3-4; *see* ECF No. 24-2 ("Moore's Depo.").

During the deposition, Moore testified that he first became aware of concerns about Monk when

Margaret Bourne, a BSE employee, reported an issue concerning Monk to her manager.  *See*

Moore's Depo. 16-17.  Moore then met with Bourne, who explained that Monk had told her that

her "collar needed to be fixed," and that, "before she could say anything, [Monk] had reached

down and fixed her collar."  *Id.* at 19.  Bourne told Moore that Monk had "invaded her personal

space and she felt extremely uncomfortable"; that Monk "stands too close when he talks"; and

that she "wasn't comfortable being alone with [Monk]" because he overshares, including by

telling employees that he caught his son and his son's girlfriend having sex and showing other

employees a video of his wife doing Pilates or yoga.  *Id.* at 19-20.  Finally, Bourne told Moore

that she was aware of a rumor "from Goldman Sachs"[4] that Monk was involved in

---

[3]     The Amended Complaint includes multiple paragraphs with the same numbers.  The
Court cites to the paragraph numbers as stated by the Amended Complaint, without regard to
whether they are duplicative.

[4]     Like the Amended Complaint, Monk's counsel and Moore used "Goldman Sachs" and
"Goldman" to refer to both GS&Co. and GS Group during the deposition.

"inappropriate" conduct with "female employees at Goldman" on a "booze cruise." *Id.* at 20-21.

Bourne did not state that she had heard it directly from "someone who worked at Goldman";

instead, she indicated that she had heard the "booze cruise" rumor from other BSE employees.

*Id.* at 21, 26.

Moore testified that, after his meeting with Bourne, he told Monk that an unnamed BSE

employee had reported that Monk had invaded the employee's personal space, described to

Monk the allegations that he had overshared personal information, and told him that there was a

rumor regarding his conduct at Goldman Sachs. *Id.* at 27-29. Monk denied the allegations and

stated that he "did not have something to do with a booze cruise." *Id.* at 29. Moore testified that,

in May 2022, he received a complaint from another female BSE employee that she was

"uncomfortable going to lunches and dinners off-site with" Monk and that the second employee

mentioned "a rumor that [Monk] had been terminated from Goldman for sexual harassment." *Id.*

at 35-36. Shortly thereafter, Moore terminated Monk's employment. *Id.* at 44.

## C. The Arbitration Agreements

During and after Monk's employment with GS&Co., he entered into no fewer than eight

agreements containing arbitration provisions (the "Arbitration Agreements").

First, upon joining GS&Co., Monk signed a Uniform Application for Securities Industry

Registration or Transfer, which is known as a "U-4 Agreement." *See* ECF No. 23, ("Hendricks

Dec."), ¶ 7. One provision in the U-4 Agreement provided as follows:

> I agree to arbitrate any dispute, claim or controversy that may arise between me
> and my *firm*, or a customer, or any other person, that is required to be arbitrated
> under the rules, constitutions, or by-laws of the *SROs* [Self-Regulatory
> Organizations] indicated in Section 4 (SRO REGISTRATION) as may be
> amended from time to time . . . .

ECF No. 23-1, ("U-4 Agreement"), at 11 (emphasis in original).  In turn, Section 4 identified the

National Association of Securities Dealers and the New York Stock Exchange, predecessor

entities of the Financial Industry Regulatory Authority ("FINRA").  *Id.* at 2-3.

Second, when hired by GS&Co., Monk also signed an Employee Agreement Regarding

Confidential and Proprietary Information and Materials and Non-Solicitation Agreement (the

"Confidentiality Agreement").  Hendricks Dec. ¶ 9.  It provided as follows:

> [A]ny dispute or claim arising out of, based upon or relating in any way to this
> Agreement, or to your employment at Goldman Sachs or the termination of your
> employment, will be settled and finally determined by arbitration.  Any such
> arbitration will be conducted in New York City before the American Arbitration
> Association or any other organization referred to in the arbitration provisions of
> any uniform application for Securities Industry Registration you have signed.

ECF No. 23-3 ("Confidentiality Agreement"), ¶ 11.

Third, on five occasions during his employment with GS&Co., Monk received as

compensation certain Restricted Stock Units ("RSUs").  Hendricks Dec. ¶¶ 10-11.  In

each instance, he executed a Signature Card Agreement (together, the "Signature Card

Agreements").  The Signature Card Agreements included the following provision:

> I further agree to arbitrate, . . . to the fullest extent permitted by law, all claims
> arising out of or relating to my employment with the Firm or the termination
> thereof, or otherwise concerning any rights, obligations or other aspects of my
> employment relationship with the Firm.

*E.g.*, ECF No. 25-6 ("Signature Card Agreement"), at 1; *see also* ECF Nos. 23-6, 23-7,

23-8, 23-9, and 23-10.

Finally, after he left GS&Co., Monk entered into a settlement agreement (the

"Settlement Agreement") with GS&Co. and GS Group to resolve a dispute concerning

certain RSUs.  Hendricks Dec. ¶ 12.  The Settlement Agreement provided as follows:

> To the fullest extent permitted by law, any dispute, controversy or claim between
> or among Monk and any party released by Monk herein, arising out of or based
> upon or relating in any way to this Agreement, or to Monk's employment or other

association with GS&Co., or the termination of Monk's employment, will be settled by arbitration.  Any such arbitration will be conducted in New York City before the Financial Industry Regulatory Authority ("FINRA") in accordance with applicable FINRA rules then in effect.

ECF No. 23-12 ("Settlement Agreement"), ¶ 8.

## DISCUSSION

Invoking all eight of the Arbitration Agreements, the Goldman Defendants move, pursuant to the Federal Arbitration Act, ("FAA"), 9 U.S.C. § 1 *et seq.*, to compel arbitration. Monk opposes on two grounds: that the FAA does not apply and that his claims do not fall within the scope of the Arbitration Agreements.  Neither argument is persuasive.

### A.  Applicability of the FAA

Monk's contention that the FAA does not apply is easily rejected.  The FAA applies to any arbitration agreement contained in "a contract evidencing a transaction involving commerce."  9 U.S.C. § 2.  The Supreme Court has held "that the word 'involving' is broad and is indeed the functional equivalent of 'affecting,'" *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273-74 (1995), "signal[ing] an intent to exercise Congress' commerce power to the full," *id*. at 277.  More relevant here, the Supreme Court has held that this broad scope generally encompasses "[e]mployment contracts, except for those covering workers engaged in transportation."  *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002); *see also Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 123 (2001) ("Arbitration agreements allow parties to avoid the costs of litigation, a benefit that may be of particular importance in employment litigation.").

The Arbitration Agreements plainly fall within the broad scope of the FAA.  Indeed, courts have repeatedly held that the U-4 Agreement "is a contract involving the sale of securities and thus involves commerce."  *Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 659 (5th Cir. 1995); *accord Fletcher v. Kidder, Peabody & Co.*, 81 N.Y.2d 623, 630 (1993).  The

6

Confidentiality Agreement, the Signature Card Agreements, and the Settlement Agreement also fall well within the broad sweep of Congress' Commerce Clause powers. Each concerns Monk's employment or compensation as a private wealth advisor for a global investment bank. Monk managed the wealth of investors across the United States and, as part of that work, engaged in transactions around the world. *See* Hendricks Decl. ¶¶ 5-12. The Signature Card Agreements and Confidentiality Agreement pertained to Monk's compensation for those services, and the Settlement Agreement resolved claims relating to certain RSUs to which Monk claimed he was entitled as a result of his services. .

Monk argues that the FAA does not apply because the "causes of action" in this case have "nothing to do with a transaction involving commerce." ECF No. 32 ("Pl.'s Opp'n"), at 7. "Under the plain language of Section 2 of the FAA," however, "the relevant question is not whether *the claim* arises from a transaction involving commerce, but rather whether *the contract* containing the arbitration clause evidences a transaction involving commerce.'" *Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374, 400 (S.D.N.Y. 2021) (cleaned up) (emphasis in original).[5] Accordingly, the FAA plainly governs whether Monk is required to arbitrate his claims.

**B. Whether Monk's Claims Fall Within the Scope of the Arbitration Agreements**

The Court turns, then, to whether the FAA compels arbitration of Monk's claims. Under the FAA, parties may contract to arbitrate their disputes, and such agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "embodies a national policy favoring

---

[5]     Monk would be wrong even if the relevant question was claim-specific. Monk alleges that defamatory statements of Jane/John Doe, an employee of GS&Co., made "in the course of Doe's employment with Goldman Sachs," Am. Compl. ¶ 1, were "intended to malign Plaintiff in his professional activities and were designed to induce others, including and specifically BSE from doing business with Plaintiff," *id.* ¶ 26. Thus, his claims involve "commerce."

arbitration" founded upon "a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, [their] disputes." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012) (cleaned up).  Indeed, Congress passed the Act in order to counteract "judicial hostility" toward arbitration, *Allied-Bruce Terminix Cos.*, 513 U.S. at 270-72, and to "place[] arbitration agreements upon the same footing as other contracts," *Schnabel*, 697 F.3d at 118 (internal quotation marks omitted).  Arbitration remains, however, "a matter of consent, and thus is a way to resolve those disputes — *but only those disputes* — that the parties have agreed to submit to arbitration." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (citations and internal quotation marks omitted) (emphasis in original).

"The threshold question facing any court considering a motion to compel arbitration is therefore whether the parties have indeed agreed to arbitrate." *Schnabel*, 697 F.3d at 118. "Unless the parties clearly and unmistakably provide otherwise" — and here, they have not — "the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).  "If a court finds that the parties agreed to arbitrate, it should then consider whether the dispute falls within the scope of the arbitration agreement." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 (2d Cir. 2002).  The party seeking to compel arbitration "bears [the] initial burden of demonstrating that an agreement to arbitrate was made"; the burden then shifts to the party resisting arbitration to show that the agreement is inapplicable or invalid.  *Hines v. Overstock.com*, 380 F. App'x 22, 24 (2d Cir. 2010) (summary order); *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010).  Here, there is no dispute that Monk entered into agreements with GS&Co. (and in the case of the Settlement Agreement, with the GS Group

too) to arbitrate, namely the Arbitration Agreements.  The only question is whether Monk's

claims fall within the scope of these agreements.

The answer is they do.  The Court begins and ends with the U-4 Agreement — although

the answer would almost certainly be the same under the other Arbitration Agreements as well,

given the broad language of their arbitration provisions.  The U-4 Agreement requires arbitration

of "any dispute, claim or controversy that may arise between [Monk] and [his] *firm*," namely

GS&Co., "that is required to be arbitrated under the rules, constitutions, or by-laws of" FINRA.

U-4 Agreement 11 (emphasis in original).  As relevant here, FINRA Rule 13200(a), in turn,

provides that "a dispute must be arbitrated . . . if the dispute arises out of the business activities

of a member or an associated person and is between or among Members, Members and

Associated Person, or Associated Persons."  ECF No. 24-4, at 1 (cleaned up).  FINRA Rule

13100(q) defines the term "Member" to include "any broker or dealer admitted to membership in

FINRA, whether or not the membership has been terminated, suspended, cancelled, revoked, the

member has been expelled or barred from FINRA or the member is otherwise defunct."  ECF

No. 24-5, at 2.  And FINRA Rules 13100(b) and 13100(u) combine to define "Associated

Person" to include both "[a] natural person who is registered or has applied for registration under

the Rules of FINRA" and "a person formerly associated with a member."  *Id.* at 1-2.

The dispute here is plainly between a "member" and an "associated person" as these

terms are defined in the FINRA Rules.  There is no dispute that GS&Co. is (and, at all relevant

times, was) a member of FINRA and was previously a member of FINRA's predecessor entities,

the NYSE and NASD.  Hendricks Dec. ¶ 4.  And Monk qualifies as an "associated person" by

virtue of his prior registration under the Rules of FINRA and his former association with

GS&Co.  *Id.* ¶¶ 5-6.  Contrary to Monk's assertions, *see* Pl.'s Opp'n 7, the fact that Monk is no

longer employed by GS&Co. or registered under the FINRA Rules is immaterial because, as

noted, the FINRA Rules expressly define "associated person" to include "a person *formerly*

*associated with a member*," ECF No. 24-5, at 2 (emphasis added); *see Hawkins v. Toussaint Cap.*

*Partners, LLC*, No. 08-CV-6866 (PKL), 2010 WL 2158332, at *4 (S.D.N.Y. May 27, 2010)

("The Court holds that Hawkins is an Associated Person pursuant to FINRA Rules because he

applied for registration under the Rules of FINRA and was formerly associated with a member."

(internal quotation marks omitted)).  Thus, whether this dispute is subject to arbitration under the

U-4 Agreement turns on whether it "arises out of the business activities of a member or an

associated person."

It does.  The FINRA Rules do not define the term "business activities."  Courts, however,

have broadly construed the term to include "employment-related disputes between a FINRA

member and an associated person." *Christensen v. Nauman*, 73 F. Supp. 3d 405, 412 (S.D.N.Y.

2014) (citing cases).  Significantly, in determining whether a dispute falls within that broad

scope, a court must "'focus on the factual allegations in the complaint rather than the legal

causes of action asserted.'" *Id.* (quoting *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846

(2d Cir. 1987)).  Moreover, the court must "review[] the Complaint's factual allegations mindful

of the strong federal policy favoring arbitration and of its duty to construe arbitration clauses as

broadly as possible." *Id.* (internal quotation marks omitted).  Ultimately, "[i]f the allegations

underlying the claims 'touch matters' covered by the parties' business activities, then those

claims must be arbitrated, whatever the legal labels attached to them." *Kouromihelakis v.*

*Hartford Fire Ins. Co.*, 48 F. Supp. 3d 175, 185 (D. Conn. 2014) (cleaned up); *see Greenberg v.*

*Ameriprise Fin. Servs., Inc.*, No. 15-CV-3589 (ADS), 2016 WL 3526025, at *8 (E.D.N.Y. Mar.

31, 2016) (defining the question to be whether the plaintiff's claims "'touch upon' *either* the

Plaintiff's or the Defendants' 'business activities' as FINRA 'members' or 'associated persons'" (emphasis in original)).

*Kouromihelakis* and *Greenberg* are especially instructive here.  In *Kouromihelakis*, the plaintiff alleged that his former employer had defamed him by filing a public disclosure with FINRA after his termination, falsely claiming that he had forged a document when he worked for the defendant.  *See* 48 F. Supp. 3d at 179.  The court granted the defendant's motion to compel arbitration because, "the underlying dispute" was "whether the plaintiff forged a document in January 2011 while he was employed by the defendant."  *Id.* at 185.  That dispute, the court reasoned, fell "squarely within the scope of FINRA Rule 13200(a) because it 'ar[ose] out of the business activities' between the parties."  *Id.*  Similarly, in *Greenberg*, the plaintiff brought tort claims relating to a letter that a defendant sent to the Florida Department of Insurance alleging that the plaintiff, while working for Woodbury Financial Services, Inc. ("Woodbury"), a FINRA member, was engaged in fraud.  *See Greenberg*, 2016 WL 3526025 at *1.  The court found that the dispute was arbitrable under the plaintiff's U-4 Agreement.  "[T]he parties," the court explained, "dispute whether the accusations . . . were true and therefore, a trial of [the Plaintiff's] tort claims will necessarily entail an inquiry into the Plaintiff's 'business activities' for Woodbury, a FINRA 'member'; whether Woodbury authorized him to solicit life insurance in Florida; whether the Plaintiff did in fact solicit life insurance in Florida; and if so, whether that was outside the scope of his relationship with Woodbury.  All of these questions 'touch upon' the Plaintiff's 'business activities' as an 'associated person.'"  *Id.* at *8.

The same result is mandated here.  First, as in *Greenberg*, resolution of the parties' disputes in this case "will necessarily entail an inquiry" into Monk's "business activities" for GS&Co., *id.* at 8 — including, for example, whether Monk did or did not commit sexual

harassment while employed at GS&Co.  Second, the dispute is arbitrable whether or not it touches upon Monk's own business activities as an associated person.  Monk explicitly alleges that his "termination emanated from false and defamatory statement(s) made by Doe, *in the course of Doe's employment with Goldman Sachs*."  Am. Compl. ¶ 1 (emphasis added).  He further alleges that, "when Doe made the offending statements as aforedescribed, *Doe was acting in the course of his/her employment by Goldman Sachs*," *id.* ¶ 33 (emphasis added), and that "any knowledge that Doe had regarding Plaintiff at the time the statements were made was obtained *through Doe's employment with Goldman Sachs*," *id.* ¶ 34 (emphasis added).  Thus, Monk expressly ties his tort claims to the business activities of GS&Co.  It follows that the parties' dispute falls within the broad scope of FINRA Rule 13200(a), which provides, as relevant here, that "a dispute must be arbitrated under the Code if the dispute arises out of *the business activities of a member*."  ECF No. 24-4 (cleaned up) (emphasis added); *see, e.g.*, *In re Lehman Bros. Sec. & ERISA Litig.*, 706 F. Supp. 2d 552, 560 (S.D.N.Y. 2010) (holding that because the plaintiff alleged that the employer was liable under a *respondeat superior* theory, as Monk does here, the parties' dispute was "manifestly . . . 'in connection with [the employer's] business activities'").

As *Greenberg* and other cases make plain, Monk is wrong in arguing that his claims are not subject to arbitration because they arose "*after* his employment with the Defendants ended." Pl.'s Opp'n 8 (emphasis in original); *see also, e.g.*, *Balan v. Tesla, Inc.*, 840 F. App'x 303, 304-05 (9th Cir. 2021) (summary order) (holding that an arbitration clause covering claims "arising from or relating to" the plaintiff's employment with the defendant applied to a post-employment statement by the defendant because "[r]esolving the defamatory nature of the statement" would require an inquiry into actions taken during the plaintiff's employment); *Hawkins v. Questar*

*Cap. Corp.*, No. 12-cv-376, 2013 WL 5596897, at *4 (E.D. Ky. Oct. 11, 2013) (holding post-contractual tortious interference claims were arbitrable and noting that "[FINRA] Rule 13200 does not . . . contain any time limitation provisions"); *Johnson v. Charles Schwab & Co.*, No. 09-CV-81479, 2010 WL 678126, at *4 (S.D. Fla. Feb. 25, 2010) (holding that a defamation claim arising out of a letter sent to the plaintiff's employer by the plaintiff's former employer seven years after the plaintiff had voluntarily resigned was subject to FINRA arbitration).  In arguing otherwise, Monk cites *Coudert v. Paine Webber Jackson & Curtis*, 705 F.2d 78 (2d Cir. 1983). *See* Pl.'s Opp'n 4.  But the Second Circuit itself later clarified that *Coudert* "missed the mark" to the extent it "implied that no torts committed after employment ends are arbitrable," explaining that tort claims may still "arise out of" employment if the claims "involve significant aspects of the employment relationship." *Fleck v. E.F. Hutton Grp.*, 891 F.2d 1047, 1052 (2d Cir. 1989) (cleaned up).  Monk also cites *McMahon v. RMS Electronics, Inc.*, 618 F. Supp. 189 (S.D.N.Y. 1985), and *Citadel Broadcasting Corp. v. Dolan*, No. 09-CV-6914 (SAS), 2009 WL 4928935 (S.D.N.Y. Dec. 21, 2009), for the proposition that, "in this Circuit, agreements to arbitrate disputes arising from a contract do not extend to tort claims that, although factually related, are considered legally distinct from the contractual relationship between the parties." Pl.'s Opp'n 5. The arbitration agreements in *McMahon* and *Citadel Broadcasting*, however, were limited to disputes arising from or relating to the *contracts* themselves. *See McMahon*, 618 F. Supp. at 192; *Citadel Broadcasting Corp.*, 2009 WL 4928935, at *5.  The U-4 Agreement is not so limited; instead, as discussed, it applies broadly any dispute arising out of the "business activities" of either Monk or GS&Co.

In short, the U-4 Agreement requires arbitration of Monk's claims against GS&Co.  It also requires arbitration of Monk's claims against GS Group and Doe, even though they were not

parties to the Agreement or FINRA members themselves.  Once again, *Greenberg* is instructive.

The *Greenberg* court ordered arbitration of claims beyond those against the defendants who were

registered with FINRA and subject to Rule 13200(a) because they were "entirely derivative" of

the claims subject to the FINRA Rules.  2016 WL 3526025 at *7.  Indeed, the court noted, the

plaintiff did "not treat the Defendants differently in his complaint or in his legal arguments in

opposition to the Defendants' present motion." *Id.*  So too here.  Monk's claims against GS

Group and Doe are "entirely derivative" of his claims against GS&Co., and Monk does not

distinguish among the three Defendants in his Amended Complaint or in his briefing on the

Goldman Defendants' motion.  On top of that, the Goldman Defendants expressly argued in their

opening brief that "[t]he Court should," for the foregoing reasons, "also compel Monk's claims

against GS Group and Doe to arbitration," Defs.' Memo 18, and Monk did not respond to that

point in his opposition.  Accordingly, he has forfeited any argument to the contrary. *See*

*Rodriguez v. Carson*, 401 F. Supp. 3d 465, 470 (S.D.N.Y. 2019).

## CONCLUSION

For the reasons stated above, the Goldman Defendants' motion to compel arbitration

must be and is GRANTED.  Two matters remain.  First, the Goldman Defendants filed a letter-

motion to seal the vast majority of the Settlement Agreement.  *See* ECF No. 20; *see also* ECF

No. 26 (granting the request temporarily, pending a decision on the motion to compel

arbitration).  It is well established that filings that are "relevant to the performance of the judicial

function and useful in the judicial process" are considered "judicial documents" to which a

presumption in favor of public access attaches. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d

110, 119 (2d Cir. 2006).  A three-part test applies to whether documents may be placed under

seal.  First, "a court must . . . conclude that the documents at issue are indeed 'judicial

documents' . . . and that therefore a common law presumption of access attaches." *Id.* at 119.

Second, the court "must determine the weight of that presumption," which is "governed by the

role of the material at issue in the exercise of Article III judicial power and the resultant value of

such information to those monitoring the federal courts." *Id.* (internal quotation marks omitted).

"Finally, . . . the court must balance competing considerations against" the presumption of

access, including "the danger of impairing law enforcement or judicial efficiency and the privacy

interests of those resisting disclosure." *Id.* at 120 (internal quotation marks omitted). The party

or parties seeking to maintain information filed under seal — here, the Goldman Defendants —

bear "the burden . . . to demonstrate that the interests favoring non-access outweigh those

favoring access." *United States v. Amodeo*, 44 F.3d 141, 148 (2d Cir. 1995). To justify sealing

on the ground that a party's business interests may be harmed, that party "must make a particular

and specific demonstration of fact showing that disclosure would result in an injury sufficiently

serious to warrant protection; broad allegations of harm unsubstantiated by specific examples or

articulated reasoning fail to satisfy the test." *Ashmore v. CGI Grp. Inc.*, 138 F. Supp. 3d 329,

351 (S.D.N.Y. 2015), *aff'd*, 923 F.3d 260 (2d Cir. 2019).

     Applying these principles here, the Court concludes that the settlement amount may be

redacted from the Settlement Agreement. The settlement amount had no relevance to the

Goldman Defendants' motion to compel arbitration, and the law favors confidentiality of such

information to incentivize the resolution of disputes. *See, e.g.*, *In re: Gen. Motors LLC Ignition

Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 1317975, at *1-2 (S.D.N.Y. Mar. 2, 2016);

*Suda v. Sushiden Corp.*, No. 10-CV-5692 (JGK), 2011 WL 1210206, at *1 (S.D.N.Y. Mar. 23,

2011) ("[T]he amount of the settlement payments should be redacted from the settlement

agreement that is filed publicly."). By contrast, the Goldman Defendants fail to justify their

request to seal the other terms of the Settlement Agreement.  These other terms are relevant to

whether the Monk consented to arbitrate.  For instance, one section redacted by the Goldman

Defendants certifies that Monk had discussed the Settlement Agreement with his attorneys, who

negotiated its terms, and that Monk fully understood the terms of the Settlement Agreement and

their effects.  ECF No. 25-12, at 7.  The Goldman Defendants do not sufficiently demonstrate

that the rest of the Settlement Agreement contains information that, if released to the public,

would cause injury sufficiently serious to warrant protection.  Their conclusory assertion that

"publicizing confidential settlement terms . . . will embolden potential claimants to use the

Settlement Agreement to attempt to leverage otherwise unjustified and favorable settlement

terms," ECF No. 20, at 2, is insufficient to overcome the presumption in favor of public access.

Accordingly, the Goldman Defendants' letter-motion to seal is GRANTED in part and DENIED

in part.  **No later than two days from the date of this Opinion and Order**, the Goldman

Defendants shall publicly file a copy of the Settlement Agreement redacted in accordance with

this Opinion and Order.

Second, having concluded that the parties' dispute must be arbitrated, the Court must

decide whether to dismiss or stay this action pending the arbitration.  Had any party requested a

stay, there is no question that a stay would be required pursuant to the plain language of the

FAA.  *See* 9 U.S.C. § 3; *see also Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015) ("[T]he

text, structure, and underlying policy of the FAA mandate a stay of proceedings when all of the

claims in an action have been referred to arbitration and a stay requested.").  But whether a stay

is required when, as here, no party requests one is less clear.  *Compare Bissonnette v. LePage*

*Bakeries Park St., LLC*, 49 F.4th 655, 664 (2d Cir. 2022) (Jacobs, J., concurring) (noting a circuit

split on the issue and opining that "the FAA mandates a stay whether or not a party requests

16

one"), *with id.* at 674 (Pooler, J., dissenting) (opining that when no party requests a stay, "a district court retains the authority to dismiss the action").  There is no question, however, that the Court has discretion to impose a stay pursuant to its "inherent authority to manage [its] docket[]."  *Katz*, 794 F.3d at 346.  And assuming *arguendo* that a stay is not required, the Court concludes, as an exercise of its discretion, that a stay is preferable to dismissal, as dismissal would allow Monk to "appeal at once, and thereby delay the arbitration, with associated costs and uncertainties." *Bissonnette*, 49 F.4th at 664 (Jacobs, J., concurring).

That said, the Court sees no reason to keep the case open pending arbitration. Accordingly, the Clerk of Court is directed to terminate ECF No. 21 and to administratively close the case, without prejudice to either side moving by letter-motion to reopen the case within thirty days of the conclusion of the arbitration proceedings.

SO ORDERED.

Dated: January 3, 2023
New York, New York

JESSE M. FURMAN
United States District Judge

17